**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

GERRON MAURICE LINDSEY,          )
                                 )
                  Plaintiff,     )
                                 )
        v.                       )          C. A. No. 04-1383-SLR
                                 )
LT. RISPOLI, C/O MOORE,          )
C/O VICTOR GONZALEZ,             )
SGT. CARPENTER, C/O MANNO,       )
C/O TERRY, NURSE HOLLY, and      )
NURSE BRENDA,                    )
                                 )
                  Defendants.    )

**STATE DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**STATEMENT OF FACTS**

1.      This *pro se* prisoner civil rights action was filed on October 22, 2004 against

Defendants Lieutenant Marcello Rispoli, Corrections Officer Marshall Moore IV, Corrections

Officer William Terry, Corrections Officer Victor Gonzalez, Sergeant Stephanie Carpenter, and

Corrections Officer Donna Manno ("State Defendants"). [D.I. 1]. Plaintiff also named "Nurse

Holly" and "Nurse Brenda" as defendants. On December 13, 2004, Plaintiff amended the

complaint to dismiss Nurse Holly from the action. [D.I. 6]. Waiver of service was returned

executed as to Nurse Brenda on January 27, 2005. [D.I. 13]. However, Nurse Brenda never

entered her appearance or responded to the Complaint. This Motion for Summary Judgment is

filed on behalf of State Defendants.

2.    The complaint consists solely of a series of factual allegations and does not set forth specific legal claims.  However, the complaint may be reasonably construed as asserting claims under 42 *U.S.C.* § 1983.

3.    The action arises from a series of events which occurred on October 9, 2004 when Plaintiff Gerron Lindsey ("Plaintiff") was within the custody of the Delaware Department of Correction at the Delaware Correctional Center ("DCC") in Smyrna, Delaware.  Shortly prior to 8:00 p.m. on the evening of October 9, 2004, Plaintiff was in the prison infirmary, where he had been housed on suicide watch.  [D.I. 1].  *See* Lindsey deposition attached hereto as Exhibit  A, at 14.  He was released from suicide watch and discharged from the infirmary to return to Building 18 in SHU, the maximum security housing unit.  *Id.*

4.    Defendant correctional officer Donna Manno ("Manno") was present in the infirmary immediately prior to Plaintiff's transfer to SHU.  Plaintiff told Manno that he had thoughts of hurting himself.  [D.I. 1].  Manno went to get Nurse Brenda, an infirmary nurse, who then spoke with Plaintiff.  Exhibit A at 11, 14-15.  Plaintiff recalled no other conversation with Manno.  *Id.* at 16.  Nurse Brenda told Plaintiff that he would be all right.  *Id.*  at 11, 14-15.  Plaintiff was then escorted from the infirmary to SHU by defendant correctional officer William Terry  ("Terry").  [D.I. 1].  Exhibit A at 16.  Plaintiff had no conversation with Terry.  Exhibit A at 16.

5.    When Plaintiff arrived at SHU, he was placed in a cell that was flooded and had food on the walls.  He asked defendant Sergeant Stephanie Carpenter ("Carpenter") to be placed in another cell and she declined to do so.  [D.I. 1].  Exhibit A at 12, 16.

6.    Plaintiff claims that sometime thereafter, he tied a sheet around his neck.  This activity was observed by defendant correctional officer Victor Gonzalez ("Gonzalez"), who told

Plaintiff to remove the sheet.  [D.I. 1].  Plaintiff told Gonzalez that he wanted to see the nurse because he had thoughts of hurting himself.  Exhibit A at 12.

7.       At that point, Plaintiff was taken to see Nurse Holly.[1]  Nurse Holly stated "Oh, well, by morning you'll be dead."  *See* Grievance attached hereto as Exhibit B.  She advised that Plaintiff should be returned to his cell on strip status.  [D.I. 1].  Exhibit B.

8.       Plaintiff was returned to his cell without his clothes and bedding.  Exhibit A at 12, 22-3.  In his cell, he found a metal object located under the flap in the door.  *Id.* at 24.  Plaintiff proceeded to cut his left arm with the metal object.  *Id.* at 24-25.  Blood was running down his arm onto the ground.  *Id.* at 29.  Plaintiff put the metal object into his mouth before the correctional officers came onto the tier where his cell was located.  *Id.* at 26.

9.       When Gonzalez was doing his security check on the tier, he observed that Plaintiff was bleeding and told him to step back from the door with his hands behind his back and his back facing the door.  Plaintiff complied with this request and Gonzalez called Lt. Marcello Rispoli ("Rispoli").  *Id.* at 12, 26-27.

10.      When Rispoli arrived, he entered Plaintiff's cell, reached around Plaintiff and sprayed him with cap-stun, or pepper spray.  Plaintiff was handcuffed and told to stand in the middle of the cell, which he did.  Rispoli sprayed Plaintiff with a hose, then sprayed Plaintiff directly in the face with cap-stun.  *Id.* at 12-13, 27-30.  While Rispoli was spraying Plaintiff with cap-stun and water, Rispoli and "his buddies" were laughing.  *Id.* at 28.  Plaintiff did not know who these other individuals were.  *Id.* at 29.

---

[1] At his deposition, Plaintiff alleged that Rispoli tried to influence Nurse Holly, but Plaintiff does not mention this claim in his Complaint or in his grievance filed shortly after the incident.  Exhibit A at 12, 20-21.

11.     Rispoli took Plaintiff to an interview room, where he was left naked for 20 minutes.  Rispoli threatened to sodomize him with a broom.  Other correctional officers were present, but Plaintiff did not know who they were.  [D.I. 1].  Exhibit A at 30-2.

12.     Plaintiff was then returned to the infirmary, where he gave Nurse Brenda the metal object with which he had cut himself and which had been hidden in his mouth.  Exhibit A at 13-14.  Nurse Brenda provided Plaintiff with no treatment for the cap-stun other than giving him a dry rag, which served only to rub the cap-stun into his skin.  Plaintiff was in the infirmary for three days and received no treatment for the cap-stun, which burned his skin.  [D.I. 1]. Exhibit A at 13-14, 32-33.

13.     Rispoli disputes Plaintiff's version of events.  *See* Rispoli Affidavit attached hereto as Exhibit C.[2]

14.     On October 9, 2004, Rispoli was the supervisor for the 4:00 p.m. to 12:00 a.m. shift.  His duties included Building 18 in SHU, the maximum security housing unit, as well as several other buildings.  *Id.*

15.     At approximately 8:10 p.m., Plaintiff was transferred from the prison infirmary to Building 18, where he was placed in an isolation cell to serve sanction time.  It was standard procedure to strip-search all inmates arriving in SHU to check for contraband and to check all cells for contraband prior to placing an inmate in a cell in SHU.  *Id.*

16.     When Plaintiff arrived at SHU from the infirmary that evening, Rispoli spoke with him and Plaintiff stated that he was "through playing games" and that he wanted to get his isolation time over with.  *Id.*

---

[2] The Incident Report attached to Exhibit C is redacted to protect the identity of another inmate.

17.     At approximately 10:20 p.m., Rispoli was called to Building 18 in response to statements by Plaintiff that he would hang himself.  When Rispoli arrived at Building 18, he had Plaintiff handcuffed and removed from his cell to an interview room.  *Id.*

18.     Pursuant to DCC procedure, in response to Plaintiff's claim that he wanted to hurt himself, DCC's medical provider was called to examine Plaintiff.  Prior to the arrival of medical personnel, Rispoli met with Plaintiff in the interview room and Plaintiff stated that he was not going to hurt himself but just wanted someone to mop the water in his cell, which he had thrown onto the floor.  *Id.*

19.     Plaintiff was seen by Nurse Holly Furne from DCC's medical provider, who met with Plaintiff and then advised that he could be returned to his cell on strip status as a precaution.  Strip status means that all clothing and bedding were removed from the cell.  Plaintiff was returned to his cell on strip status as directed by Nurse Furne.  *Id.*

20.     Plaintiff met with Nurse Furne alone.  Rispoli did not attempt to influence her assessment of Plaintiff in any way.  The decision to return Plaintiff to his cell was made by Nurse Furne.  *Id.*

21.     At approximately 11:10 p.m., Rispoli was called back to Building 18 in response to a report that Plaintiff had cut himself.  *Id.*

22.     When Rispoli arrived at Plaintiff's cell, he observed that Plaintiff was biting into his left arm with his teeth.  Rispoli opened the cell door and briefly sprayed Plaintiff with cap-stun (pepper spray) to stop him from injuring himself.  Rispoli sprayed Plaintiff just one time.  *Id.*

23.     Because there was a great deal of blood on Plaintiff's arm and on the floor, Rispoli used a garden hose to wash off Plaintiff's arm and the floor.  He then entered the cell and

applied a gauze bandage around Plaintiff's arm.  During this incident, neither Rispoli, nor any other correctional officers, laughed at or made any negative comments to Plaintiff.  *Id.*

24.     Plaintiff was then handcuffed and placed in an interview room.  He told Rispoli that he wanted to return to the infirmary and did not want to do his isolation time.  Rispoli did not threaten Plaintiff in any way.  *Id.*

25.     Plaintiff was seen once again by Nurse Furne, who contacted her supervisor, who directed that Plaintiff be returned to the infirmary.  Plaintiff was returned to the infirmary at approximately 12:00 a.m.  *Id.*

26.     During the course of the evening, Rispoli did not observe a sharp object, or any other item of contraband, in Plaintiff's possession or in his cell.  When Rispoli responded to Plaintiff's cell, it appeared that Plaintiff was using his teeth to injure himself.  *Id.*

27.     Plaintiff filed a grievance pertaining to the October 9, 2005 incident.  *See* Grievance attached hereto as Exhibit B.  He received the response that his complaint was non-grievable.  He did not appeal this decision or pursue the grievance further.

28.     Plaintiff also filed a medical grievance concerning his claim that he did not receive treatment for the pepper spray for three days.  *See* Grievance attached hereto as Exhibit D.  This grievance was denied on the grounds that the medical provider, FCM, determined that treatment was not warranted and that Plaintiff sustained no injury as the result of the cap-stun. *Id.*  Plaintiff did not appeal or pursue this grievance further.

## **MEMORANDUM OF LAW**

The Court shall grant a motion for summary judgment if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine if the jury could return a verdict for the nonmoving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The burden of proof is on the moving party to demonstrate the absence of material issues of fact, and inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party.  However, once the moving party advances evidence in support of its contentions, the nonmoving party must go beyond the pleadings and introduce affidavits and other evidence that will create a genuine issue of fact in order to avoid summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In this case, because there is no genuine issue of material fact, State Defendants are entitled to judgment as a matter of law.

## I.   PLAINTIFF'S CLAIMS ARE BARRED BY THE PRISON LITIGATION REFORM ACT, 42 *U.S.C.* § 1997(e).

The Prison Litigation Reform Act of 1996 ("PLRA"), 42 *U.S.C.* § 1997(e), states:  "No action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  "An action brought with respect to prison conditions" includes all "inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 520 (2002).  Further, the Third Circuit has held that a plaintiff must exhaust administrative remedies even if the grievance process would not provide him with the remedy he is seeking in his federal court action.  *Nyhuis v. Reno*, 204 F.3d 65, 71 (3d Cir. 2000).  An inmate is required to follow the grievance process through every appellate step in order to properly exhaust administrative remedies.  *Spruill v. Gillis*, 372 F.3d 218, 230 (3d Cir. 2004).

DCC has a grievance process and procedure and it is codified at DCC Procedure Number 4.4, entitled "Inmate Grievance Procedure."  *See* SOP 4.4 attached hereto as Exhibit E.  Pursuant to this

procedure, an inmate who wishes to grieve a particular issue must express the grievance in writing. The grievance process is separated into three steps. The first step involves review of the grievance by the Institutional Grievance Chair ("IGC"). If unresolved at this initial stage, the grievant is then entitled to a hearing before the Resident Grievance Committee ("RGC"). The RGC then arrives at a conclusion which is forwarded to the Warden or the Warden's designee for their review and concurrence. If the RGC fails to obtain the concurrence of the Warden, an inmate is entitled to review of the matter by the Bureau Grievance Officer ("BGO"). When all of these steps are completed, an inmate has exhausted all available administrative remedies.

In this case, Plaintiff received responses from the Institutional Grievance Chair to his two grievances relating to the incident at issue. Exhibits A, D. However, he did not pursue available appellate procedure regarding his grievances. Because Plaintiff failed to carry the grievance process through to its administrative conclusion, he procedurally defaulted and failed to exhaust his administrative remedies.

Therefore, Plaintiff's claims are barred by the PLRA's exhaustion requirement, and State Defendants are entitled to judgment as a matter of law.

## II.    STATE DEFENDANTS DID NOT VIOLATE PLAINTIFF'S CONSTITUTIONAL RIGHTS

Plaintiff's Complaint does not specifically identify separate legal claims. However, the Complaint may be interpreted as asserting four claims: State Defendants used excessive force against him, failed to provide him with adequate medical treatment, placed him in a wet and dirty cell, and failed to prevent his suicide attempt.

There are no material factual disputes as to any of these claims, and State Defendants are entitled to judgment as a matter of law.

A.  STATE DEFENDANTS DID NOT USE EXCESSIVE FORCE AGAINST
    PLAINTIFF.

1.  There Is No Evidence Of Personal Involvement By Defendants Moore,
    Gonzalez, Carpenter, Manno Or Terry.

In actions brought pursuant to 42 *U.S.C.* § 1983, an individual cannot be held liable in the

absence of personal involvement or knowing acquiescence of the alleged deprivation.  *Pennsylvania*

*v. Porter*, 659 F.2d 306, 336 (3d Cir. 1981), *cert. denied,* 458 U.S. 1121 (1982).  "[T]he officials'

misconduct cannot be merely a failure to act.  Such officials must have played an affirmative role in

the deprivation of the plaintiffs' rights, i.e., there must be a causal link between the actions of the

responsible officials named and the challenged misconduct."  *Id.*  Without identifying how they

participated in, personally directed, or acquiesced in the events which plaintiff claims deprived him

of constitutional rights, the defendants cannot be held liable and dismissal is appropriate.  *Gay v.*

*Petsock*, 917 F.2d 768, 771 (3d Cir. 1990); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.

1988).  To show "deliberate indifference," a plaintiff must demonstrate a sufficiently culpable state

of mind on the part of the defendant.  *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

In this case, Plaintiff alleges that Rispoli used excessive force in spraying him with cap-stun.

Plaintiff does not claim that any other Defendant sprayed him or used excessive force against him in

any way.  He does complain that after cap-stunning him, Rispoli sprayed him with a water hose

while he made jokes with "the other officers."  [D.I. 1].  However, at his deposition, Plaintiff

admitted that he did not know who those officers were.  Exhibit A at 29.

Thus, there is no evidence of use of force by Defendants Moore, Gonzalez, Carpenter,

Manno or Terry.  Further, there is no evidence, or allegations, of personal involvement by these

Defendants in Rispoli's alleged use of force.  In the absence of any evidence of personal

involvement, Defendants Moore, Gonzalez, Carpenter, Manno and Terry are entitled to summary

judgment on Plaintiff's excessive force claim.

        2.      Rispoli's Use Of Force Was Reasonable Under The Circumstances

In an excessive force case, the pivotal inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). *See also Whitley v. Albers*, 475 U.S. 312, 319 (1986). The court must consider: 1) the need for the application of force; 2) the relationship between the need and the amount of force that was used; 3) the extent of the injury inflicted; 4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and 5) any efforts made to temper the severity of the forceful response. *Whitley*, 475 U.S. at 321. The extent of the threat to the safety of the staff and inmates, as perceived by reasonable officials on the basis of facts known to them, must be considered in assessing the use of force. *Hudson*, 503 U.S. at 7.

The use of *de minimis* force does not constitute cruel and unusual punishment within the meaning of the Eighth Amendment unless it is "of a sort repugnant to the conscience of mankind." *Whitley*, 475 U.S. at 327. "There exists some point at which the degree of force used is so minor that a court can safely assume that no reasonable person could conclude that a corrections officer acted maliciously and sadistically." *Reyes v. Chinnici*, 54 Fed. Appx. 44, 48 (3d Cir. 2002).

This Court has previously addressed inmate excessive force claims in the context of the use of capstun or mace.

In *Johnson v. Berezansky*, 2005 WL 1026723, at *1 (D. Del. April 28, 2005) (attached hereto as  Exhibit F), plaintiff inmate became involved in a dispute with defendant correctional officer in the chow hall, was forced to throw away his food tray and return to his cell. After he

was locked into his cell, the plaintiff began to bang on the door and complained about missing

his meal.  Defendant repeatedly told plaintiff to stop calling out and banging, but plaintiff refused

to comply with this request.  Defendant then opened plaintiff's cell to speak with him.  There was

a factual dispute as to whether plaintiff then made a threatening movement towards defendant.  It

was undisputed that, after opening the cell, defendant sprayed plaintiff with cap-stun.  *Id.*

The court concluded that plaintiff's disorderly conduct was sufficient to create a need for

defendant to use force to quell plaintiff's behavior.  *Id.* at *3.  In reaching this conclusion, the

court noted that spraying plaintiff with cap-stun was in proportion to the need to stop him from

causing a disturbance in the facility.  *Id.* at *4.  The court also observed that defendant was in the

best position to perceive whether plaintiff posed a threat to the safety and security of the staff and

inmates.  *Id.*

In *Wright v. Snyder*, 2002 WL 1821583, at *1 (D. Del. July 8, 2002) (attached hereto as

Exhibit G), defendant correctional officers were conducting strip searches of inmates for drugs,

weapons and contraband.  Plaintiff claimed that he complied with directions but made a sarcastic

comment to defendants.  Defendants claimed that plaintiff stated that he would not comply and

moved towards them in a threatening manner, at which time he was sprayed once with cap-stun.

Shortly thereafter, plaintiff was treated by a nurse.  The medical notes indicated that "no other

trauma was seen . . . denies other injuries."  *Id.*

The court found that plaintiff's actions demonstrated that he did not obey defendants'

orders to permit a body cavity search for contraband.  *Id.* at *3.  Defendants' claim that plaintiff

lunged towards them stated a reasonably perceived threat justifying use of force.  The amount of

force used, pepper spray, was reasonably related to the need for force because defendants

believed that plaintiff was moving in a threatening manner, and the purpose of the pepper spray

was to subdue unruly subjects. Finally, defendants tempered the severity of their response to plaintiff's actions by taking him to see a nurse after he was sprayed. *Id.* The court granted defendants' motion for summary judgment. *Id.* at *4.

In *Wilson v. Reinhart*, 2003 WL 21756393 (D. Del. July 29, 2003) (attached hereto as Exhibit H), defendant correctional officer became involved in a dispute with plaintiff in the chow hall. *Id.* at *1. Plaintiff then returned to his cell. Plaintiff alleged that, shortly thereafter, defendant came to his cell and attempted to instigate a physical confrontation, and when he did not respond, she sprayed mace into his face and locked him into his cell. *Id.*

Defendant officer claimed that when plaintiff returned to his cell, he was yelling and kicking his cell door. Defendant asked plaintiff's cellmate to try to calm plaintiff and also asked plaintiff if he would like to talk to a counselor. In response, plaintiff moved towards defendant in a hostile manner, at which time she sprayed him and called for backup. *Id.*

Plaintiff was then seen by medical. The medical report indicated that plaintiff's respiration was even and non-laboring, his vital signs were stable and there was no sign of trauma. *Id.* at *2.

The court found that because plaintiff admitted that he may have been disorderly in interacting with defendant in the chow hall, there was a need for the use of force. *Id.* at *4. "Although it is disputed whether or not plaintiff threatened [defendant], plaintiff's disorderly conduct was sufficient to create a need for [defendant] to use force to alleviate the situation." *Id.*

Because the force used was minor, there was a correlation between the need for force and the force actually used. "Spraying plaintiff with mace was in proportion to the need to stop plaintiff from causing a disturbance in the prison. Even if, as plaintiff claims, he did not threaten [defendant] and only acted disorderly, her response was reasonable under the circumstances." *Id.*

Defendant used only sufficient force to gain control of the situation and call for backup. Further, plaintiff failed to show more than a *de minimis* injury. *Id.* at *5.

Finally, the court observed that great deference is given to prisons in adopting and implementing policies designed to maintain order, discipline and security. *Id.* "[Defendant] was in the best position to perceive any threat to her safety or the security of the prison by plaintiff's behavior." *Id.* The court held that, in the absence of evidence that defendant acted maliciously or sadistically, plaintiff failed to state a claim. *Id.*

In this case, under the *Whitley v. Albers* factors, the evidence shows that Rispoli used force in a good-faith effort to prevent Plaintiff from harming himself further and not maliciously and sadistically to cause harm.

Plaintiff admits that he cut his own arm with a sharp object and that blood was running down his arm and onto the floor of his cell. Exhibit A at 24-29. Plaintiff's conduct in cutting himself clearly created a need for the use of force to prevent further injury. The brief use of cap-stun was in proportion to the need to stop Plaintiff from injuring himself further. Rispoli was in the best position to assess whether Plaintiff posed a threat to the safety of himself or others. The severity of the use of force was tempered by the fact that Plaintiff was seen by medical after the incident. Further, any injury sustained by Plaintiff was *de minimis.* Exhibit D.

Thus, under the *Whitley v. Albers* factors, Rispoli is entitled to judgment as a matter of law.

B.  STATE DEFENDANTS DID NOT VIOLATE PLAINTIFF'S RIGHT TO
     ADEQUATE MEDICAL CARE.

To establish a violation of his Eighth Amendment right to adequate medical care, an inmate "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

With respect to the second requirement, a prison official's denial of an inmate's reasonable request for medical care constitutes deliberate indifference if the denial of the request causes the inmate to experience undue suffering or the threat of tangible residual injury. *Williams v. First Correctional Medical*, 377 F. Supp. 2d 473, 476 (D. Del. 2005). In addition, deliberate indifference may be established if "necessary medical treatment is delayed for non-medical reasons, or if an official bars access to a physician capable of evaluating a prisoner's need for medical treatment." *Id. See also Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir. 1979). However, a prison official is deliberately indifferent only where he or she has the required mental state. *Williams,* 377 F. Supp. 2d at 476. That is, a prison official can be held liable only where "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Mere allegations of negligence do not meet the pleading requirements for deliberate indifference. *Estelle*, 429 U.S. at 105-106.

In this case, Plaintiff complains that he did not receive treatment after he was sprayed with cap-stun and taken to the infirmary. Specifically, he claims that Nurse Brenda gave him only a dry rag with which to wipe off the cap-stun and he was otherwise left without treatment for three days.

There are no allegations, or evidence, that State Defendants were responsible for the medical care provided to Plaintiff after he was taken to the infirmary. Plaintiff's access to medical care was neither denied nor delayed. He can show no deliberate indifference on the part of State Defendants with respect to care rendered for his exposure to cap-stun.

14

Plaintiff also appears to complain that he was discharged from the infirmary prematurely when he was returned to SHU. However, there are no allegations, or evidence, that State Defendants played any role in the decision to discharge Plaintiff from the infirmary. Plaintiff does allege that, before he left the infirmary, he told Manno that he wanted to injure himself. However, Plaintiff concedes that Manno communicated his statement to Nurse Brenda, and he actually spoke to Nurse Brenda about his concerns, and she took no action in response to his statements. Exhibit A at 11, 14-15.

Finally, Plaintiff's allegations may be construed as asserting that he should have been transported to the infirmary sooner during the events that occurred on his tier in SHU. However, it is undisputed that medical was contacted when Plaintiff first expressed that he wanted to injure himself. Plaintiff was seen by Nurse Holly from the Medical Department, and she advised that Plaintiff should be returned to his cell on strip status. Exhibit C. After Plaintiff was discovered injuring his arm, medical was contacted again and he was returned to the infirmary. *Id.*

Thus, Plaintiff was provided with access to medical care, and he can show no deliberate indifference by any of the State Defendants.

Further, any claim by Plaintiff that he should have received different treatment does not state a constitutional violation. When some care has been provided, questions as to the adequacy or propriety of the care will not support an Eighth Amendment claim. *Smullen v. Kearney*, 2003 WL 21383727, at *3 (D. Del. June 13, 2003) (attached hereto as Exhibit I). Courts will not second-guess a course of treatment, which presents a question of professional judgment. *Id.*

Therefore, on these facts, State Defendants are entitled to summary judgment on Plaintiff's claim of inadequate medical care.

C.  PLAINTIFF'S PLACEMENT IN A DIRTY CELL DID NOT CONSITUTE CRUEL
     AND UNUSUAL PUNISHMENT.

Plaintiff claims that he was housed in a cell in SHU which was wet and which had food

on the walls.  Exhibit A at 12, 16.  Plaintiff was in this cell from 8:10 until 11:10 p.m.  Exhibit C.

Plaintiff asked Carpenter to move him to another cell, and she declined to do so.  Exhibit A at

12, 16.  There are no allegations that any other State Defendant had personal involvement in this

incident.

Even assuming that Plaintiff's allegations are correct, his brief placement in a wet, dirty

cell does not rise to the level of a constitutional violation.

Conditions of confinement amount to cruel and unusual punishment only where the

conditions "result[] in unquestioned and serious deprivation of basic human needs."  *Rhodes v.*

*Chapman*, 452 U.S. 337, 347 (1981).  The Eighth Amendment "does not mandate comfortable

prisons" and conditions imposed may be "restrictive and even harsh."  *Id.* at 347, 349.  An

important factor in determining whether conditions of confinement meet constitutional standards

is the length of confinement.  *See Hutto v. Finney*, 437 U.S. 678, 686-87 (1978) ("A filthy,

overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for

weeks or months").  For example, in *Qawi v. Howard*, 2000 WL 1010281, at *3 (D. Del. July 7,

2000) (attached hereto as Exhibit J), during a prison lockdown, plaintiff was confined to his cell

without toilet facilities for six hours.  During that time period, he had to urinate into a drinking

glass and a breakfast bowl and defecate twice into a paper bag.  The court found no constitutional

violation where Plaintiff was subjected to unsanitary conditions for such a brief duration of time.

*Id.* at *3 -*4.

In this case, Plaintiff was housed in a wet cell with food on the walls for three hours.

Clearly, this condition of confinement does not rise to the level of a constitutional violation, and

State Defendants are entitled to summary judgment as a matter of law.


### D.  STATE DEFENDANTS WERE NOT DELIBERATELY INDIFFERENT IN FAILING TO PREVENT PLAINTIFF'S SUICIDE ATTEMPT.

In his Complaint, Plaintiff does not specifically allege that State Defendants violated his

constitutional rights by failing to prevent his suicide attempt.  However, to the extent that his

Complaint is interpreted as presenting this claim, State Defendants are entitled to judgment as a

matter of law.

While a prisoner's suicide attempt can support a Section 1983 claim, this type of claim

presents difficult issues because no state actor directly inflicted harm on the prisoner.  *Swan v.

Carello*, 923 F. Supp. 626, 631 (D. Del. 1995).  To prevail on such a claim, "a plaintiff must

show that prison officials were deliberately indifferent in failing to prevent the self-inflicted

harm."  *Id.*  In a prisoner suicide case, the plaintiff has the burden of establishing that:  1)  the

prisoner had a particular vulnerability to suicide, 2) the custodial officer or officers knew of that

vulnerability and 3) those officers acted with reckless indifference to the prisoner's particular

vulnerability.  *Id.* at 632.  *See also Colburn v. Upper Darby Township*, 946 F.2d 1017, 1023 (3d

Cir. 1991).  The Third Circuit has cautioned that the court "cannot infer from the prisoner's act

of suicide itself that the prison officials have recklessly disregarded their obligation to take

reasonable precautions to protect the safety of prisoners entrusted to their care."  *Freedman v.

City of Allentown*, 853 F.2d 111, 1114 (3d Cir. 1988).  "To do so would be 'tantamount to

requiring jailers to provide suicide-proof institutions,' whereas their duty under the Eighth

Amendment is only to 'ensure reasonable safety.'"  *Swan*, 923 F. Supp. at 632 (citations omitted).

In *Swan*, in response to reports by his parents that he was suicidal, Swan was placed in the infirmary on full suicide watch.  *Id.* at 629.  He was stripped of all of his belongings except his underwear.  He was given a blanket without a nylon border.  He was scheduled to be checked by prison personnel every 15 minutes.  The cell had a narrow window in the back wall with a vertical bar running down the center.  *Id.*

Plaintiff was admitted to the infirmary at 4:00 p.m.  At 1:39 p.m. the next day, he was found hanging in his cell with one end of the blanket tied to the vertical bar on the window and the other end tied to his neck.  *Id.*  at 630.  Plaintiff sustained permanent brain damage as the result of his suicide attempt.  *Id.* at 631.

The court held that plaintiff failed to show deliberate indifference by defendant prison officials.  The fact that additional preventative measures, such as double-bunking, were available but not implemented did not affect the analysis of whether the defendants met their obligation to take reasonable precautions to protect the safety of prisoners.  *Id.*

The allegation that Swan was not checked every fifteen minutes according to prison policy was not dispositive.  Plaintiffs alleged that, that between 8:00 a.m. and 1:39 p.m. on the day that Swan attempted suicide, only 9 or 10 of the required 18 security checks were made.  *Id.* at 634.  The court found that this failure to comply with policy did not rise to the level of a constitutional violation.  "[T]he constitutional standard of deliberate indifference is not defined with respect to whether or not prison procedures were completely satisfied."  *Id.* at 636.

Further, plaintiffs could not satisfy their burden of showing deliberate indifference by pointing to an internal investigation which found the officers negligent in failing to make the

required fifteen minute checks.  *Id.* at 634-635.  "While they may not have conducted a check every 15 minutes, and while the failure to do so might rise to the level of negligence, the facts do not support the conclusion that missing a number of checks during the day constitutes deliberate indifference."  *Id.* at 635.  The court concluded that the officers' conduct did not demonstrate the type of callous disregard for safety necessary to show deliberate indifference.  *Id.*

The court observed that the constitution did not require the State to provide suicide-proof prisons, and that while it was possible that defendants could have done more to prevent Swan's suicide attempt, no evidence existed from which a reasonable jury could find that defendants were deliberately indifferent.  *Id.*

For the purpose of this Motion only, State Defendants do not dispute that Plaintiff had a vulnerability to suicide and State Defendants were aware of this vulnerability.  However, there is no evidence that State Defendants recklessly disregarded their obligation to take reasonable precautions to protect Plaintiff's safety.  Therefore, Plaintiff cannot show that State Defendants were deliberately indifferent, and they are entitled to judgment as a matter of law.

State Defendants played no role in the decision to initially release Plaintiff from the infirmary.  When Plaintiff told Manno that he wanted to hurt himself, she reported this to Nurse Brenda, who took no steps to prevent Plaintiff's return to SHU.  Exhibit A at 11, 14-15.

When Plaintiff was back in SHU, in response to his subsequent statement to Gonzalez that he wanted to injure himself, medical was contacted pursuant to prison procedure.  Nurse Furne evaluated Plaintiff and, rather than ordering his return to the infirmary, directed that he be returned to his cell on strip status.  Lt. Rispoli followed this instruction and placed Plaintiff in his cell on strip status.  Exhibit C.

Plaintiff claims that he injured himself with a sharp metal object.  However, there is no evidence that State Defendants were aware that Plaintiff had this object, or any other object with which he could harm himself.  Exhibit C.  According to Plaintiff, he found the object under a flap in his cell.  He hid the object in his mouth prior to the officers arriving on the tier.  Exhibit A at 24-26.  It appeared to Lt. Rispoli that Plaintiff was injuring himself with his teeth.  Lt. Rispoli then took steps to stop this self-injury by briefly spraying Plaintiff with cap-stun.  Exhibit C. Plaintiff did not disclose the fact that he had the metal object until he was returned to the infirmary, when he removed the object from his mouth and gave it to Nurse Brenda.  Exhibit A at 13-14.

Plaintiff may argue that State Defendants could have done more to prevent his suicide attempt.  However, State Defendants took reasonable steps to protect Plaintiff.  At most, their conduct was negligent but did not show the type of callous disregard for an inmate's safety necessary to show deliberate indifference.  Thus, State Defendants are entitled to judgment on any claim by Plaintiff that they violated his constitutional rights in failing to prevent his suicide attempt.

## III.    STATE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY IN THEIR INDIVIDUAL CAPACITIES

To determine whether a state official is entitled to qualified immunity, the court must conduct a two-part inquiry:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? . . .
> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the

right was clearly established.

*Saucier v. Katz,* 533 U.S. 194, 201 (2001). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201.

With respect to Plaintiff's claim that State Defendants used excessive force, he cannot show any personal involvement by State Defendants Moore, Gonzalez, Carpenter or Manno. Therefore, he cannot establish the threshold requirement that his constitutional rights were violated by these State Defendants.

As to Lt. Rispoli, he was faced with an emergency situation where an inmate was engaged in self-harm. Under the *Whitley v. Albers* factors, Lt. Rispoli's use of cap-stun constituted a good faith effort to prevent further injury. Thus, a reasonable official in Lt. Rispoli's circumstances could not know that his conduct presented a constitutional violation.

With respect to Plaintiff's claim of inadequate medical care, State Defendants did not delay or bar Plaintiff's access to care. Further, the courts have held that, as long as some care is provided, there is no constitutional violation. Therefore, reasonable officials in State Defendants' circumstances could not know that their conduct would present a constitutional violation.

With respect to Plaintiff's claim that he was housed in a wet and dirty cell for three hours, the case law establishes that this condition of confinement does not rise to the level of a constitutional violation. Therefore, reasonable officials in State Defendants' circumstances could not know that their conduct would present a constitutional violation.

Finally, with respect to any claim that they failed to prevent Plaintiff's suicide attempt, State Defendants followed the directions of the prison medical department to return Plaintiff to SHU and then to return him to his cell on strip status. When Plaintiff was observed harming himself, he was cap-stunned to prevent further injury, seen by medical and returned to the infirmary. Thus, reasonable officials in State Defendants' circumstances could not know that their conduct would present a constitutional violation. Further, Plaintiff cannot meet the threshold requirement of showing the deliberate indifference needed to establish that his constitutional rights were violated.

Therefore, State Defendants are entitled to qualified immunity as a matter of law and cannot be held liable to Plaintiffs in their individual capacities.

## IV.    UNDER THE ELEVENTH AMENDMENT, STATE DEFENDANTS CANNOT BE HELD LIABLE IN THEIR OFFICIAL CAPACITIES

"[I]n the absence of consent, a suit [in federal court] in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). This preclusion extends to state officials when "the state is the real, substantial party in interest." *Id.* at 101 (*quoting Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)). "Relief sought nominally against an [official] is in fact against the sovereign if the decree would operate against the latter." *Id.* (*quoting Hawaii v. Gordon*, 373 U.S. 57, 58 (1963)). A State may waive its Eleventh Amendment immunity. However, such waiver must constitute an "unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment." *Ospina v. Dep't of Corrections*, 749 F. Supp. 572, 578 (D. Del. 1990) (*quoting Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 n.1 (1985)).

In this case, the State of Delaware has neither consented to Plaintiff's suit nor waived its immunity. Therefore, under the Eleventh Amendment, State Defendants cannot be held liable in their official capacities.

WHEREFORE, for the reasons stated herein, State Defendants respectfully request that this Court grant summary judgment in their favor, in both their official and individual capacities, on all claims.

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

/s/ Eileen Kelly
Eileen Kelly (I.D. 2884)
Deputy Attorney General
Carvel State Building
820 N. French Street, 6th Floor
Wilmington, Delaware 19801
(302) 577-8400
eileen.kelly@state.de.us
Dated: December 29, 2005                    Attorney for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2005, I electronically filed *State Defendants' Memorandum of Points And Authorities In Support of Their Motion for Summary Judgment* with the Clerk of Court using CM/ECF.  I hereby certify that on December 29, 2005, I have mailed by United States Postal Service, the document to the following non-registered party:  Gerron Lindsey.


/s/ Eileen Kelly
Deputy Attorney General
Department of Justice
820 N. French St., 6th Floor
Wilmington, DE 19801
(302) 577-8400
eileen.kelly@state.de.us